**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE EX PARTE APPLICATION OF UNION DES ASSOCIATIONS EUROPÉENNES DE FOOTBALL (“UEFA”) FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING | Case No. 26-mc-___ |

**DECLARATION OF ANDRE KURZ, ATTORNEY-AT-LAW, IN SUPPORT OF APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

**DECLARATION OF ANDRE KURZ, ATTORNEY-AT-LAW, IN SUPPORT OF APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

André Kurz, attorney-at-law, declares the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am an attorney admitted to practice law in Switzerland since April 30th, 2013. I held various positions as in-house legal counsel and have been an independent attorney-at-law since 2021. I am based in Zurich, Switzerland and practice law at Kurz Legal. Over the course of my professional career, I have gained significant experience in Swiss criminal law and criminal procedure, including domestic and cross-border commercial disputes and criminal proceedings. I believe that I am appropriately qualified to express an informed view on the matters covered by this declaration.

2. I am counsel to Union des Associations Européennes de Football ("UEFA") in connection with a contemplated Swiss criminal proceeding described below (the "Contemplated Criminal Proceeding").

3. I make this declaration based on my personal knowledge, experience, and education, and on my review of the factual record provided to me by UEFA and counsel in the United States, including the Exhibits attached to applications for discovery submitted under 28 U.S.C. § 1782 (the "Section 1782 Applications") seeking discovery from individuals and entities for use in the Contemplated Criminal Proceeding. The opinions expressed in this declaration are my own.

4. Below, I describe (I) the factual basis for the Contemplated Criminal Proceeding; (II) the elements and jurisdictional basis of the Contemplated Criminal Proceeding under Swiss criminal law; (III) UEFA's standing to bring the Contemplated Criminal Proceeding; (IV) the amenability of Swiss authorities to receiving discovery obtained through the Section 1782

Applications; and (V) the relevance of the discovery UEFA seeks to the Contemplated Criminal Proceeding.

## I. FACTUAL BASIS FOR THE CONTEMPLATED CRIMINAL PROCEEDING

5. Fédération Internationale de Football Association ("FIFA") is a Swiss nonprofit association with its statutory seat in Zurich, Switzerland. UEFA is likewise a Swiss nonprofit association, comprised of 55-member national football associations.

6. FIFA was founded in 1904 and is composed of 211 national football associations from around the world. Through its members, FIFA stands at the head of an organized system of football that reaches virtually every country in the world. FIFA's flagship competition, the FIFA World Cup, is among the largest and most valuable sporting events in the world. Despite its commercial success, FIFA is not a commercial corporation operated for the benefit of shareholders or private owners; it is a nonprofit membership association whose stated objectives include expanding and improving football worldwide, organizing international competitions, developing the women's game, promoting football's educational, cultural, and unifying values, and protecting the sport from corruption.

7. FIFA's members are organized geographically into six regional confederations, of which UEFA—the confederation representing Europe—is among the most consequential to the governance, economics, and competitive success of the global game. UEFA's members are the 55 national football associations responsible for governing the sport throughout Europe, including the associations of England, France, Germany, Italy, and Spain, among others. Those 55 associations are also members of FIFA and represent more than one-quarter of FIFA's entire membership, and Europe holds nine seats on FIFA's 37-member Council, the largest representation of any confederation. UEFA thus serves as one of the principal institutional voices within FIFA representing the interests of a constituency responsible for an outsized share of the global game's

sporting and economic value.

8. FIFA is, at its core, a member-driven organization. Ultimate authority rests with the FIFA Congress, which FIFA's own Statutes designate as its supreme and legislative body; the Congress consists of FIFA's 211 member associations, each of which has one vote, and among other responsibilities elects the FIFA President, approves and amends FIFA's governing Statutes, and elects members of FIFA's principal independent bodies. Beneath the Congress sits the 37-member FIFA Council, which sets FIFA's strategic direction and oversees the organization between meetings of the Congress; the Council's members are elected through FIFA's six regional confederations (with exception to the Presidents of the six Confederations who are ex officio vice-presidents of the FIFA Council) rather than selected by the President, ensuring that FIFA's constituent membership is represented in the organization's principal governing body. The FIFA President sits within, not above, that structure: the President is elected by FIFA's members to represent the organization and preside over the Congress and Council, has no vote in the Congress, and ordinarily holds only one vote among the 37 members of the Council. Although FIFA owns the commercial rights arising from its competitions, FIFA's Statutes provide that the Council alone decides whether and how those rights are to be promoted, including whether FIFA will do so itself, jointly with third parties, or through third parties.

9. On July 28, 2026, FIFA publicly announced a plan, known as "FIFA Forward Enterprise" or "FFE," to transfer the commercial rights to the men's and women's World Cups and the Club World Cup into a new subsidiary and to sell an interest of approximately 20 percent of that subsidiary to outside investors, led by Joshua Kushner through a Thrive Capital Management–affiliated permanent-capital investment vehicle for approximately USD 4.2 billion. Greg Maffei, the CEO of BANN Ventures, and J.P. Morgan acted as advisers on the plan.

10. Among other documents, I have reviewed FIFA President Gianni Infantino's own letter of July 28th to the FIFA Council announcing the proposal, in which Infantino states that "the financial commitment of an anchor investor in FIFA Forward Enterprise has been secured, Thrive Capital, who have agreed to underwrite this proposal," and that the anchor investor's commitment would guarantee the proposed payments to FIFA's member associations. That letter confirms that Thrive's commitment as anchor investor had already been finalized before the FIFA Council or the 211 member associations were consulted on, or asked to approve, the proposal. *See* Infantino Letter (Exhibit A).

11. I understand that the FFE proposal was developed over a period of months by a small circle around Infantino without the knowledge or involvement of the FIFA Council, the confederations, or FIFA's 211 member associations. I further understand that Infantino personally negotiated the material terms of the FFE proposal directly with Kushner and Thrive, without a competitive process, an independent valuation, or referral to FIFA's ordinary procurement or related-party approval procedures, and that Infantino and Kushner have a relationship that predates the FFE proposal, as well as a relationship cultivated over years with Kushner's brother, Jared Kushner, and, through that relationship, with the President of the United States. Under FIFA's own Statutes, the FIFA Congress—composed of FIFA's 211 member associations, each holding one vote—is the supreme and legislative body of the organization, and the FIFA Council is vested with exclusive authority to decide how FIFA's commercial rights are to be promoted. Neither body was consulted or afforded the opportunity to approve the FFE proposal. The proposal was instead approved internally by a narrow three-to-two vote of a five-member bureau of FIFA's internal management board convened and controlled by Infantino, at which the two FIFA executives principally responsible for the organization's day-to-day operations and finances declined to

endorse it one of which (Kevin Lamour) has left FIFA on 17 August 2026. The FFE proposal was publicly announced on July 28, 2026, and withdrawn on or about August 1, 2026, following near-universal opposition from FIFA's stakeholders.

12. I have reviewed a July 31, 2026 public statement by FIFA's own Chief Operating Officer describing the FFE proposal as follows: "the project that has sparked so much controversy and debate is not a FIFA project. It is even less a project of FIFA's administration. It is the project of one person," and further stating that FIFA's own administration, in addition to the FIFA Vice-Presidents, the FIFA Council, the confederations, the federations, the players, the leagues, the clubs, and the fans, had been "deceived." The FIFA Officer further describes the episode as reflecting "a lack of trust, a lack of transparency, a lack of discernment, a lack of good governance," and states that FIFA's mission is "to serve football, not to serve the personal interests of a person who, unfortunately, believes he embodies FIFA when he is supposed to be at its service." *See* Lamour Statement (Exhibit B).

13. I have also reviewed the resignation statement of Carlos Cordeiro, then a Senior Advisor to the FIFA President and a former President of the U.S. Soccer Federation, in which he stated that he "had no involvement in this proposal," that FIFA "already has access to extraordinary financial resources" and "sits on billions of dollars in reserves and no debt," such that "selling a permanent stake in football's most valuable asset to raise $4.2 billion makes little sense," and posed the unanswered question at the heart of the transaction: "Who benefits? Was there a competitive process? What governance will be in place? What will investors ultimately gain, and at what cost to football?" *See* Corderio Statement (Exhibit C).

14. I have further reviewed a statement by Arsene Wenger, FIFA's Chief of Global Football Development, confirming that he "was not involved in this strategic plan and first became

aware of the project through media reports." *See* Wenger Statement (Exhibit D).

15. UEFA and other interested parties are now preparing to lodge a criminal complaint in Switzerland against Infantino and possibly other FIFA officials and advisers under Article 158 of the Swiss Criminal Code ("SCC"), relating to criminal mismanagement, together with such further or alternative charges as the developed factual record may support, arising out of a transaction that, according to the explanations provided to me, was engineered by Infantino for his own personal, financial, and reputational advantage and, in the process, inflicted direct and concrete injury on all of FIFA's members, associations and affiliates.

16. I further understand that contemporaneous reporting indicated Infantino was considering a commissioner-style or chair role in the proposed new commercial vehicle carrying compensation of approximately USD 30 million per year, far in excess of Infantino's compensation as FIFA President; that this prospective arrangement was not disclosed to FIFA's members or confederations; and that no mechanism was established to ensure that Infantino's personal financial interest in the transaction did not influence his role in developing and advancing the transaction.

17. I have reviewed FIFA's own contemporaneous internal communications materials, including a July 29, 2026 set of "frequently asked questions" that FIFA circulated to its member associations, which expressly asked "Does FFE create a future role or compensation package for any specific individual?" and answered: "No. The proposal does not establish a future role or compensation package for any specific individual." *See* FIFA FAQs (Exhibit E).

18. That denial, made the day after the FFE proposal was publicly unveiled, is difficult to reconcile with the contemporaneous reporting that Infantino himself was already considering a paid commissioner-style role in the very entity being created, and is itself the kind of representation

that discovery from Thrive, Kushner, BANN, Maffei, J.P. Morgan and others concerning their own discussions with Infantino about his prospective role and compensation would help to test.

19. I understand that this is not the first occasion on which Infantino's personal conduct in office has been the subject of scrutiny or investigation, including prior inquiries into his personal use of FIFA resources and undisclosed meetings with Swiss prosecutorial authorities.

## II. THE CONTEMPLATED CRIMINAL PROCEEDING

20. Article 158 SCC provides, in relevant part, that "Any person who by law, an official order, a legal transaction or authorisation granted to them, has been entrusted with the management of the property of another or the supervision of such management, and in the course of and in breach of their duties causes or permits that other person to sustain financial loss shall be liable to a custodial sentence not exceeding three years or to a monetary penalty [...] If the offender acts with the intention of securing an unlawful gain for themselves or another, a custodial sentence not exceeding five years or to monetary penalty shall be imposed." art. 158 para. 1 SCC ("Criminal Mismanagement").[1]

21. Any person who commits a felony or misdemeanor in Switzerland is subject to the SCC. *See* Art. 3 para. 1 SCC. A felony or misdemeanor is considered to be committed at the place where the person concerned commits it, or unlawfully omits to act, and at the place where the offense has taken effect. Art. 8 para. 1 SCC. Criminal Mismanagement is a material felony with two results. The first is the financial loss (impoverishment) sustained by the aggrieved party. The second is the unlawful gain (enrichment) sought by the perpetrator, of which only the intention—to the exclusion of realization—is a constituent element of the offense. Accordingly, both the place where the financial loss occurred and the place where the unlawful gain sought by the perpetrator

[1] The Swiss federal government publishes an English language translation of the Swiss Criminal Code at https://www.fedlex.admin.ch/eli/cc/54/757_781_799/en.

was to occur, or did occur, constitute the place of the result within the meaning of Article 8 SCC.

22. Based on the factual record provided to me, FIFA is a Swiss association with its statutory seat in Zurich, the FFE proposal was developed and directed by Infantino from FIFA's Zurich headquarters, and any resulting financial loss to FIFA would be a loss to Swiss associations reflected in FIFA's Swiss-audited accounts. Because the place of the financial loss and the place from which the alleged abuse of authority was directed both lie in Switzerland, Swiss law enforcement authorities have jurisdiction over the Contemplated Criminal Proceeding under Articles 3 and 8 SCC. Within Switzerland, the local competent jurisdiction would be the Canton of Zurich, and the competent authority to investigate and prosecute the Contemplated Criminal Proceeding would be the public prosecutor's office having territorial jurisdiction over FIFA's registered seat in Zurich.

## III. UEFA'S STANDING TO BRING THE CONTEMPLATED CRIMINAL PROCEEDING

23. UEFA is entitled to report the conduct described herein to the Swiss law enforcement authorities under Article 301 para. 1 of the Swiss Criminal Procedure Code ("CrimPC"), which permits any person to denounce criminal offences, and the offence of Criminal Mismanagement is prosecuted *ex officio* irrespective of an application from an aggrieved person as defined by Article 115 CrimPC. UEFA is a Swiss association with its seat in Switzerland whose institutional rights within FIFA are fixed by the FIFA Statutes; whose members' commercial and reputational interests are directly and immediately affected by the permanent alienation of an interest in FIFA's commercial enterprise on the terms described in the Application submitted in connection with his Declaration; and whose 55 member associations are entitled to development funding drawn from the same revenue base that the FFE transaction proposed to sell in part. Accordingly, UEFA has legal standing to lodge a criminal complaint in Switzerland against Infantino and possibly other

natural persons to be identified.

24. UEFA has publicly characterized the FFE process as "governance by intimidation—an act of coercion unworthy of an institution entrusted with the stewardship of the global game," and has resolved, together with its 55 national associations, to oppose the transaction. UEFA's individual member associations, as constitutional voting members of FIFA under Article 26(1) of the FIFA Statutes have an equivalent and independent entitlement to report the conduct to the Swiss authorities.

25. The identity of the ultimate targets of the Contemplated Criminal Proceeding, and the final charges retained, will not be decided by UEFA but by the competent Swiss public prosecutor on the basis of the evidence gathered during the investigation, including any evidence obtained through the Section 1782 Applications. Potential defendants are any persons who are found to have perpetrated the criminal mismanagement, or such other offenses as the developed factual record may support.

## IV. <u>SWISS AUTHORITIES ARE AMENABLE TO RECEIVING DISCOVERY OBTAINED THROUGH THIS APPLICATION</u>

26. There is no indication that the competent Swiss prosecutor or criminal court would decline to receive or consider the documentary and testimonial evidence sought through the Section 1782 Applications. To my knowledge, the admissibility of evidence obtained through U.S. judicial assistance under 28 U.S.C. § 1782 has never been successfully challenged before a Swiss court of appeal. In my professional experience, such evidence has been routinely received and relied upon by Swiss prosecutors and courts in criminal proceedings, including in preliminary criminal investigations. Such evidence is therefore admissible in the Swiss criminal courts, and the Section 1782 Applications do not circumvent any proof-gathering restriction or exclusionary rule under Swiss law.

27. None of the recipients of the Section 1782 Applications are expected to be parties to the Contemplated Criminal Proceeding. Absent the assistance of the United States District Courts and the requested orders and subpoenas, this evidence and testimony would, in my experience, almost certainly remain outside the reach of the relevant criminal court of Zurich.

## V. THE DISCOVERY SOUGHT IN THE SECTION 1782 APPLICATION IS RELEVANT TO THE CONTEMPLATED CRIMINAL PROCEEDING

28. The discovery sought is not intrusive or unduly burdensome under Swiss law. UEFA seeks documentary and testimonial evidence concerning financial and transactional information that sophisticated investment and commercial advisers and their principals would ordinarily maintain in the regular course of evaluating and structuring a transaction of this kind, and UEFA's request is limited to matters directly relevant to the Contemplated Criminal Proceeding.

29. This discovery bears directly on the elements of the contemplated Article 158 SCC charge—the authority under which FIFA officials acted and any abuse of that authority, the financial-loss element, the intent element, and the identity of the transaction's beneficiaries.

30. In conclusion, this type of discovery as envisaged by UEFA through its Section 1782 Applications cannot be obtained through any alternative means available to UEFA or to the competent Swiss authorities.

31. For these reasons, I support UEFA's Section 1782 Applications.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed: August 26th, 2026
Switzerland

By: ______________________
André Kurz
Kurz Legal

*Counsel for Applicant Union des Associations Européennes de Football (UEFA)*